ABRAHAM MATHEW, SBN 181110
*abraham@mathewandgeorge.com*
JACOB GEORGE, SBN 213612
*jacob@mathewandgeorge.com*
SANG J PARK, SBN 232956
*sang@mathewandgeorge.com*
MATHEW & GEORGE
500 South Grand Avenue, Suite 2050
Los Angeles, California 90071
Telephone:    (310) 478-4349
Fax:              (310) 478-9580

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHER DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN M. BAILEY, individually, on behalf of all others similarly situated, and as a representative of other aggrieved employees, | Case No.: 3-18-cv-03424-TSH |
| | Hon. Thomas S. Hixson |
| | CLASS ACTION |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| vs. | |
| KINDER MORGAN G.P., INC., a Delaware corporation; KINDER MORGAN TERMINALS, INC., a Delaware corporation; KINDER MORGAN BULK TERMINALS LLC, a Louisiana company; and DOES 1 to 10, | Date:   October 1, 2020<br>Time:   10 am<br>Place:   Courtroom G—15th Floor |
| Defendants. | |

1  TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on October 1, 2020 at 10 am, in Courtroom G—15th

3  Floor of the United States District Court for the Northern District of California, located at 450

4  Golden Gate Avenue, San Francisco, CA 94102, Hon. Thomas S. Hixson presiding, Plaintiff

5  Steven Bailey ("Plaintiff" or "Class Representative"), as an individual and on behalf of all

6  others similarly situated, and Defendants Kinder Morgan G.P., Inc., Kinder Morgan Terminals,

7  Inc. and Kinder Morgan Bulk Terminals LLC ("Defendants") (collectively, the "Parties") will,

8  and hereby do, move this Court for entry of an order and judgment granting final approval of the

9  class action settlement.

10       This Motion, unopposed by Defendants, seeks final approval of (1) Stipulation and

11  Settlement Agreement of Class Action Claims ("Settlement Agreement"), (2) settlement

12  payments to participating Class Members, (3) payment to the California Labor and Workforce

13  Development Agency, and (4) costs/expenses to the claims administrator, CPT Group, Inc.

14       This Motion is based on: (1) this Notice of Motion and Motion; (2) the Memorandum of

15  Points and Authorities in Support of Motion for Final Approval of Class Action Settlement; (3)

16  the concurrently filed Motion for Attorney's Fees, Costs, and Class Representative Service

17  Award Requests; (4) Declaration of Sang J Park; (5) Declaration of Justin Lo; (6) Declaration of

18  Steven Bailey; (7) Declaration of Daniel La of CPT Group, Inc.; (8) the [Proposed] Order

19  Granting Final Approval of Class Action Settlement; (9) the [Proposed] Judgment; (10) the

20  records, pleadings, and papers filed in this action; and (11) such other documentary and/or oral

21  evidence as may be presented to the Court at or prior to the hearing of this Motion.

22                        Respectfully Submitted,

23  Dated: August 27, 2020          MATHEW & GEORGE

24

25                     /s/ Sang J Park

26  By:_____
               Sang J Park

27

28           Attorneys for Plaintiff and Class

# TABLE OF CONTENTS

I.     INTRODUCTION……………………………...……………….................  1

II.    FACTS AND PROCEDURE…………….......………….....…….……....…..  2

       A.     Overview of Case…………………………………………….......  2

              1.   Plaintiff's theory of case……………………………………  3

       B.     Plaintiff's counsel thoroughly investigated the factual and legal issues and
              were thus able to objectively assess the Settlement's reasonableness………..  4

       C.     Plaintiff's Counsel realistically assessed the settlement value of claims……....  5

              1.   Meal period and rest break claims…………………………………  5

              2.   Wage statement claim……………………………………………  6

              3.   Waiting-time and PAGA penalties…………………………………  7

              4.   Total exposure……….….……….………….………….……….......…  8

       D.     Parties settled after mediation.........................................................  9

       E.     Proposed settlement fully resolves Plaintiff's claims.....................................  9

              1.   Composition of the Settlement Class...........................................  9

              2.   Settlement consideration.......................................................  9

              3.   Release by the Settlement Class..................................................  10

       F.     Class Notice was completed pursuant to the Court Order……………………  10

III.   ARGUMENT……………………….…………….......….............…….…...…  11

       A.     The Standard for Final Approval has been met……………………….............  11

       B.     Plaintiff's Counsel's thorough investigation led to settlement.......................  13

       C.     Settlement was reached through arm's-length bargaining by Parties
              represented by experienced counsel....................................................  13

       D.     Settlement is reasonable given the strengths of Plaintiff's claims and the
              risks and expense of litigation.........................................................  14

E.     Settlement Class has responded positively to the Settlement....................     15

F.     The Proposed PAGA settlement is reasonable..................................................     16

G.     The Class Representative Enhancement Payment is reasonable.......................     16

H.     Claims Administrator Costs is reasonable and should receive final approval..     18

IV.     CONCLUSION……………………………………………….……….................     18

1

## TABLE OF AUTHORITIES

2

**S**TATE **C**ASES

3

*Ali v. U.S.A. Cab Ltd.*

4
    176 Cal. App. 4th 1333 (2009)...........................................................................  5

5

*Bell v. Farmers Ins. Exchange*

6
    115 Cal. App. 4th 715 (2004)..........................................................................  16

7

*Brinker Rest. Corp. v. Super. Ct.*

    53 Cal. 4th 1004 (2012).....................................................................................  6

8

*Cellphone Termination Fee Cases*

9
    186 Cal. App. 4th 1380 (2010)........................................................................  16

10

*Kullar v. Foot Locker Retail, Inc.*

11
    168 Cal. App. 4th 116 (2008)..........................................................................  14

12

*Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles*

13
    186 Cal. App. 4th 399 (2010)..........................................................................  14

14

*Nordstrom Com. Cases*

    186 Cal. App. 4th 576 (2010)..........................................................................  16

15

*Sutter Health Unins. Pricing Cases*

16
    171 Cal. App. 4th 495 (2009)…………………………………………………  14

17

*Wershba v. Apple Computer, Inc.*

18
    89 Cal. App. 4th 324 (2001)…………………………………………………..  14

19

**S**TATE **S**TATUES

20

Cal. Lab. Code § 203.........................................................................................  7

21

Cal. Lab. Code § 226…………………………………………………..…..  6

22

Cal. Lab. Code § 2699......................................................................................  7

23

**F**EDERAL **C**ASES

24

*Blackwell v. Skywest Airlines, Inc.*

25
    245 F.R.D. 453 (S.D. Cal. 2007).....................................................................  6

26

27

28

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Brown v. Fed. Express Corp.*
    249 F.R.D. 580 (C.D. Cal. 2008)..........................................................................   6

*Campbell v. Best Buy Stores, L.P.*
    2013 U.S. Dist. LEXIS 137792 (C.D. Cal. Sept. 20, 2013)..............................   5

*D'Amato v. Deutsche Bank*
    236 F.3d 78 (2d Cir. 2001)....................................................................................   13

*Fleming v. Covidien, Inc.*
    2011 U.S. Dist. LEXIS 154590 (C.D. Cal. Aug. 12, 2011)..............................   8, 16

*Gonzalez v. Officemax N. Am.*
    2012 U.S. Dist. LEXIS 163853 (C.D. Cal. Nov. 5, 2012)................................   6

*Guippone v. BH S&B Holdings LLC*
    2011 U.S. Dist. LEXIS 126026 (S.D.N.Y. Oct. 28, 2011)................................   17

*Hanlon v. Chrysler Corp.*
    150 F.3d 1011 (9th Cir. 1998)…………………………………………………   12

*Hopson v. Hanesbrands Inc.*
    2009 U.S. Dist. LEXIS 33900 (N.D. Cal. Apr. 3, 2009)..................................   16

*In re Apple Computer, Inc. Derivative Litig.*
    2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008)................................   14

*In re Atmel Corp. Derivative Litig.*
    2010 U.S. Dist. LEXIS 145551 (N.D. Cal. June 25, 2008)..............................   13

*In re Mego Fin. Corp. Sec. Litig.*
    213 F.3d 454 (9th Cir. 2000)................................................................................   17

*Jimenez v. Allstate Ins. Co.*
    2012 U.S. Dist. LEXIS 65328 (C.D. Cal. Apr. 18, 2012)................................   6

*Kenny v. Supercuts, Inc.*
    252 F.R.D. 641 (N.D. Cal. 2008)........................................................................   6

*Loud v. Eden Med. Ctr.*
    2013 U.S. Dist. LEXIS 122873 (N.D. Cal. Aug. 28, 2013)..............................   7

*Molski v. Gleich*
    318 F.3d 937 (9th Cir. 2003)…………………………………………………   12

*Officers for Justice v. Civil Serv. Comm'n*
   688 F.2d 615 (9th Cir. 1982)………………………………………………    12

*Rodriguez v. West Publ'g Corp.*
   563 F.3d 948 (9th Cir. 2009)...............................................................    12, 17

**FEDERAL STATUE**

FED. R. CIV. P 23………………………………………………………….    11

**OTHER**

Conte & Newberg, *Newberg on Class Actions* (4th ed. 2002)..............................    17

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3        On April 10, 2020 this Court granted preliminary approval of the Stipulation and

4    Settlement Agreement of Class Action Claims [1] and approved distribution of the Notice of Class

5    Action Settlement to all Class Members ("Class Notice").

6        On May 22, 2020 the Court-appointed claims administrator completed the initial mailing

7    of Class Notice to all Class Members.  On June 10, 2020 the claims administrator completed a

8    corrective mailing.  Class Members were given 60 days to submit requests for exclusion and

9    objections to the Settlement, and the following resulted: only 11 Class Members submitted an

10   valid exclusion request (opt-out); 2 Class Members submitted an objection to the Settlement;

11   Settlement had a 95.70% participation rate; 100% of the Net Settlement Fund was claimed by

12   245 Participating Class Members; and, <u>average gross payment to Class Members equaled

13   $2,116.33, with the estimated highest gross payment being $5,647.01</u>. (Declaration of Daniel La

14   ["La Decl."] ¶¶ 6-14)

15       And the Settlement also contributed to a policy change: Defendants now automatically

16   pay Class Members an additional hour of pay for rest breaks, regardless of whether they take it

17   or not.  So current Class members and future employees will continue to benefit from the

18   Settlement for years to come.

19       Needless to say, the Settlement was received favorably by the Class.

20       Plaintiff now seeks final approval of the below Settlement:

21       (1)    Settlement Class Members: all non-exempt employees who worked as Pipeline

22              Operators and/or Pipeline Controllers in Defendants' California locations from

23              May 2, 2014 to Preliminary Approval

24       (2)    Total Settlement Amount of $800,000 that includes:

25              (a)    Net Settlement Fund (i.e., Total Settlement Amount minus Fees and Cost

26

27       [1]    "Settlement Agreement" or "Settlement."  Unless indicated otherwise, capitalized
         terms used here have the same meaning as those defined by the Settlement Agreement.

28

Award, Claims Administration Costs, PAGA Payment, and the Service

Award) allocated to Settlement Class

    (i)    <u>One hundred percent</u> of the Net Settlement Fund will be paid

        to Class Members, and not retained by Defendants

  (b)  Distribution of the Net Settlement Fund based on the percentage of

      weeks worked by each individual Class Member compared to weeks

      worked by all Class Members

  (c)  $240,000 Attorneys' Fees and $7,586.62 in costs to Class Counsel

  (d)  $14,000 Claims Administration Costs to Claims Administrator

  (e)  $10,000 PAGA Payment pursuant to Private Attorneys General Act

  (f)  $10,000 Service Award to Plaintiff Steven M. Bailey for his efforts and

      general release of claims against Defendants

The Settlement is undoubtedly fair, reasonable, and adequate—and meets approval under Fed. R. Civ. P. and California law. Accordingly, and given the Settlement's favorable terms and the manner they were received by Class Members, Plaintiff respectfully request that the Court: (1) grant final approval of Settlement; (2) enter judgment pursuant to the Settlement; and (3) retain jurisdiction to enforce the Settlement.

## II. FACTS AND PROCEDURE

### A. Overview of Case

Defendants are a large energy infrastructure company in North America. They own and operate approximately 84,000 miles of pipelines and 180 terminals. Their pipelines transport natural gas, refined petroleum products, crude oil, carbon dioxide and more. They also store a variety of products at their terminals such as gasoline, jet fuel, ethanol, coal, petroleum coke and steel. Each terminal operates continuously, 24 hours a day, seven days a week.

Defendants employed Plaintiff Steven Bailey as a Pipeline Operator and/or Pipeline Controller, a non-exempt and/or hourly position, at their Rocklin, California facility from March 1982 to July 7, 2017. (*See* Declaration of Sang J Park [Park Decl. ¶__] ¶¶ 3-4)

### 1.    Plaintiff's theory of case

On May 2, 2018 Plaintiff brought the instant wage and hour Class action primarily challenging two of Defendants' company-wide practices that stem from their alleged unlawful uniform policies: failure to provide duty-free uninterrupted Labor Code-compliant rest breaks, and failure to provide duty-free uninterrupted Labor Code-compliant meal periods.

All remaining claims—i.e., unpaid minimum wage, wages not paid on termination, non-compliant wage statements, PAGA penalties and Cal. B&P 17200 (Unfair Business Practices)—were derived from Defendants' meal and rest period policy and practices. (Park Decl. ¶¶ 5-6)

Plaintiff posited the following facts in support of his claims.

Defendants required Plaintiff and class members to work 12-hour shifts—from 6 pm to 6 am or 6 am to 6 pm.  Defendants required Plaintiff and class members to work their shifts alone and to stay at their station at all time during their 12-hour shifts.

For example, Plaintiff operated up to 5 pipelines alone during his 12-hour shifts.  He operated the valves and pumps of each pipeline to ensure that the correct petroleum product would be pumped out to the correct pipeline at the correct time.

Throughout their shifts, Defendants required Plaintiff and the other Operators to monitor the transport process, respond to upsets and critical events, and maintain the safe and stable operation of their units.

In order to do so, Defendants required Plaintiff and other Operators to remain attentive, carry radios, and be reachable at all times during their shifts.  Defendants also required Plaintiff and other Operators to remain in contact with supervisors and other employees working in their unit throughout their shifts.

Consequently Plaintiff and class members never received off-duty breaks because they were constantly and continuously responsible for their units. (Park Decl. ¶ 7)

Defendants obviously dispute Plaintiff's claims.  Defendants posited, among others, that Plaintiff worked lawful on-duty meal periods, and they regardless paid Plaintiff meal period premiums.  And Defendants provided all duty-free rest breaks to Plaintiff. (Park Decl. ¶ 8)

1

2

**B.      Plaintiff's Counsel thoroughly investigated the factual and legal issues and were thus able to objectively assess the Settlement's reasonableness**

3      Plaintiff's Counsel thoroughly investigated and researched Class claims and their

4  theories of liability, their defenses, and the developing body of law before the Settlement.  The

5  comprehensive investigation included the exchange of informal and formal discovery and

6  statistical information with Defendants; multiple fact-finding sessions with Plaintiff; and,

7  several conferences with Defense counsel. (Park Decl. ¶ 9)

8      Plaintiff received, among others, the following information, data and documents relevant

9  to Class-wide liability ("Class Data") in support of his investigation and evaluation of Class

10 claims:  (1) employee time and payroll records; (2) total number of former and current

11 employees in the Class Period; (3) total number of workweeks; (4) total number of shifts and

12 pay periods; (5) average rate of pay; (6) employee handbooks, procedure manuals, and

13 operations manuals addressing Defendants' wage and hour practices, e.g., (i) timekeeping and

14 payroll policies, (ii) meal and rest periods, (iii) wage statements; and (8) employee schedules.

15 (Park Decl. ¶ 10)

16      Plaintiff's Counsel then applied the Class Data to Class members to determine when

17 meal breaks were missing, late or short, and to determine the number of rest breaks that were

18 owed to them. (Park Decl. ¶ 11)

19      Needless to say Plaintiff's Counsel made an informed decision about the strengths and

20 weaknesses of Plaintiff's theories of liability, Defendant's affirmative defenses, Class-wide

21 damages, and benefits of Settlement based on the receipt, analysis, and application of the Class

22 Data. (Park Decl. ¶ 12)

23      Further, and continuing their due diligence, Plaintiff's Counsel (1) determined Plaintiff's

24 suitability as a Class representative, through interviews, background investigations, and analyses

25 of his employment files and related records; (2) researched wage-and-hour class actions

26 involving similar claims; (3) engaged in the discovery process; (4) obtained and analyzed

27 Defendants' wage-and-hour policies and procedures; (5) obtained and analyzed time and

28 corresponding payroll records to determine violation rates and penalty payments; (6) researched

the latest case law bearing on the theories of liability; (7) researched settlements in similar cases; (8) analyzed the value of Plaintiff's claims; (9) drafted a mediation brief; (10) negotiated the terms of the Settlement; (11) finalized the Settlement and Release; (12) finalized the Notice of Class Action Settlement; and (13) drafted preliminary approval papers. (Park Decl. ¶ 13)

### C. Plaintiff's Counsel realistically assessed the settlement value of claims

As detailed below, Plaintiff's valuation involved the aggregate value of claims and discounting for risks of continued litigation (Park Decl. ¶ 15)

#### 1. Meal period and rest break claims

As detailed above, Plaintiff alleged that Defendants enforced a scheduling policy and practice that made it difficult for Class Members to take uninterrupted duty-free meal periods and rest breaks.  Plaintiff calculated Defendants' maximum exposure for the meal periods and rest breaks of $2,812,830, respectively, by taking the product of the total number of shifts during the Class Period (approximately 91,385) and estimated average hourly rate of pay ($30.78).

Defendant's maximum theoretical exposure had to be offset by the strength of its defenses (e.g., on-duty meal period agreements, payment of meal period premiums, no widespread meal period and rest break violations, and Defendants authorized and permitted meal periods and rest breaks), and the likelihood of certifying the Class, winning on liability, and prevailing on appeal.

Plaintiff provided a deeper discount for the rest break claim because employers do not have an obligation to record rest periods (rest periods are paid breaks).  The relative lack of written proof—except for anecdotal Class Member testimony—would have reduced the likelihood of certifying the claim.

Plaintiff especially recognized the risks of Class certification presented by the following recent decisions: See, e.g., *Ali v. U.S.A. Cab Ltd.*, 176 Cal. App. 4th 1333, 1341 (2009) (denying certification because employees' declarations attesting to having taken meal periods and rest breaks demonstrated that individualized inquiries were required to show harm); *Campbell v. Best Buy Stores, L.P.*, 2013 U.S. Dist. LEXIS 137792, at *30-41 (C.D. Cal. Sept. 20, 2013)

(following *Brinker* and denying certification of proposed meal period and rest break class due to lack of uniform policy); *Jimenez v. Allstate Ins. Co.*, 2012 U.S. Dist. LEXIS 65328 (C.D. Cal. Apr. 18, 2012) (denying motion to certify meal period and rest break class based on employer's practice of understaffing and overworking employees); *Gonzalez v. Officemax N. Am.*, 2012 U.S. Dist. LEXIS 163853 (C.D. Cal. Nov. 5, 2012) (same); *Brown v. Fed. Express Corp.,* 249 F.R.D. 580, 587-88 (C.D. Cal. 2008) (denying certification of driver meal period and rest break claims based on the predominance of individual issues); *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 645 (N.D. Cal. 2008) (denying certification on meal periods claim); *Blackwell v. Skywest Airlines, Inc.*, 245 F.R.D. 453, 467-68 (S.D. Cal. 2007) (declining to certify class action because individual issues predominated when different employee stations provided different practices with respect to meal periods).

Realistically, and considering the real risks of continued litigation, Plaintiffs valued the meal period and rest break claims for settlement purposes between $35,160 and $70,320, and $175,801 and $351,603, respectively. (Park Decl. ¶¶ 16-20)

### 2.    Wage statement claim

Plaintiff alleged that Defendants failed to properly itemize Class Members' wage statements in violation of Labor Code § 226(a).  Penalties for violations of section 226(a) are assessed at the rate of $50 for the initial pay period in which a violation occurs and $100 per employee for each violation in a subsequent pay period, not to exceed an aggregate of $4000 dollars per employee. [Cal. Lab. Code § 226(e)]

Plaintiff calculated Defendants' maximum exposure for the wage statement claim of $395,650 by taking the product of the approximate total statutory pay periods worked by Class Members (approximately 3968) and the statutory penalty.

Plaintiff then offset Defendants' maximum exposure by the strength of its affirmative defenses and the risks of continued litigation.

Defendants commonly argue that Class Members are not harmed by non-compliant wage statements, and Courts should not penalize employers for purported unintentional errors on wage statements.  Before Section 226(e) was amended, the dispositive issue was whether

1    "suffering injury" was satisfied by the deprivation of a legal right or by consequential damages

2    caused by the non-compliant wage statements.  Employers had frequently prevailed in arguing

3    for the latter interpretation.  Even after the enactment of section 226(e), some courts have held

4    that this amendment merely clarified existing law and held that Plaintiffs must demonstrate

5    actual injury. See *Loud v. Eden Med. Ctr.*, 2013 U.S. Dist. LEXIS 122873, **36-53 (N.D. Cal.

6    Aug. 28, 2013) (granting summary judgment on wage statement claim because plaintiff could

7    not show injury due to defects and that incorrect wage information is not willful)  Even if wage

8    statement claims survive summary judgment, the strength of the claim is inextricably tied to the

9    strength of the underlying predicate claims (i.e., liability for any wage statement claim is

10    completely derivative).

11        Hence, and considering the risks of continued litigation, Plaintiff valued the wage

12    statement claim for settlement purposes between $49,456 and $98,912. (Park Decl. ¶¶ 21-25)

13              **3.      Waiting-time and PAGA penalties**

14        Plaintiff alleged waiting-time[2] and PAGA penalties[3] for Defendants' purported

15    violations of underlying Labor code violations.  Plaintiff estimated Defendants' maximum

16    potential recovery on waiting-time and PAGA penalties at $428,458 and $791,300, respectively.

17    Although the formulae for calculating maximum penalties under Labor Code §§ 203 and

18    2699(f)(2) are fairly straightforward, analysis becomes more difficult for settlement purposes

19    because waiting time and PAGA claims are only as strong as the underlying predicate claims.

20        First Defendants could have argued that waiting-time penalties are applicable only when

---

[2]    Under California law, if an employer discharges an employee, all wages earned and unpaid at the time of discharges are due and payable immediately to the employee.  Failure to pay an employee all wages and premium pay owed, including overtime premiums, reporting time pay, meal period/rest period premiums, and split shift premium pay, may entitle an employee to waiting time penalties.  These penalties continue for up to 30 calendar days. Waiting time penalties are computed by multiplying the employee's daily wage rate by the specified number of days since the payment of the wages became due, not to exceed 30 calendar days. *See* Lab. Code § 203.

[3]    Under PAGA, the civil penalty for violations of any of the code provisions enumerated by Lab. Code § 2699.5 is one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each subsequent violation. *See* Lab. Code § 2699(f)(2).

the failure to pay wages at termination is "willful." (*See* Lab. Code § 203; Cal. Code Regs., tit. 8, § 13520)[4]  Second PAGA penalties are discretionary, i.e., a judge may order a defendant to pay all penalties, or none at all—even if the plaintiff proves liability.[5]

Hence, and considering the risks of continued litigation, Plaintiff valued all penalty claims at between $276,110 and $552,220. (Park Decl. ¶¶ 26-28)

### 4.    Total exposure

In aggregate, and as detailed above, Plaintiff estimated Defendants' maximum potential exposure for the claims at issue at approximately $7.2 million.

Taking into account the discount factors, and the risks of continued litigation, Plaintiff determined that a settlement of approximately 12% of Defendants' maximum potential exposure for the class claims was fair and reasonable. (Park Decl. ¶ 29)  *See, e.g., In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 256-58 (D. Del. 2002) (recognizing that a reasonable settlement amount can be 1.6% to 14% of the total estimated damages); *In Re Armored Car Antitrust Litig.,* 472 F. Supp. 1357, 1373 (N.D. Ga. 1979) (settlements with a value of 1% to 8% of the estimated total damages were approved); *In Re Four Seasons Secs. Laws Litig.,* 58 F.R.D. 19, 37 (W.D. Okla.1972) (approving 8% of damages); *Balderas v. Massage Envy Franchising, LLP,* 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (finding settlement which amounted to 8% of maximum recovery "[fell] within range of possible initial approval on the strength of plaintiff's case and the risk and expense of continued litigation."); *In re Omnivision Techs., Inc.,* 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement of 6% to 8% of estimated damages).

---

[4]    Defendants would also have argued a good faith dispute as to whether wages are due precludes the imposition of waiting time penalties. Cal. Code Regs., tit. 8, § 13520.

[5]    "For purposes of this part, whenever the Labor and Workforce Development Agency, or any of its departments, divisions, commissions, boards, agencies, or employees, has discretion to assess a civil penalty, a court is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty." Lab. Code § 2699(e)(1). Courts have not hesitated in exercising this discretionary authority. See, e.g., *Fleming v. Covidien, Inc*., No. ED CV10-01487, 2011 U.S. Dist. LEXIS 154590, at *8–9 (C.D. Cal. Aug. 12, 2011) (slashing PAGA penalties for wage statement violations by over 500%, from $2.8 million to $500,000).

1

**D.      Parties settled after mediation**

2      The Parties agreed to private mediation to attempt to resolve the Class claims.  On July

3  23, 2019 the Parties attended an all-day mediation with Howard Hay, Esq.—a well-regarded

4  mediator with experience in resolving wage and hour class actions.  The Parties reached the

5  Class Settlement at the mediation.  At all times the Parties' negotiations were adversarial and

6  non-collusive. (Park Decl. ¶ 14)

7      **E.      Proposed settlement fully resolves Plaintiff's claims**

8          **1.      Composition of the Settlement Class**

9      The proposed Settlement Class Members consist of all of Defendants' current and/or

10  former non-exempt employees who worked for Defendants as Pipeline Operators and/or

11  Pipeline Controllers in the state of California between May 2, 2014 and the Preliminary

12  Approval Date at the following California facilities of Defendants:  Barstow, Bradshaw

13  (Sacramento), Brisbane, Carson, Chico, Colton, Concord, Fresno, Imperial, Industry, Los

14  Angeles, Mission Valley (San Diego), Orange, Richmond, Rocklin, San Jose, Stockton and

15  Watson (Long Beach).

16      And the Settlement Class is broken into two subclasses: "Operator 12 Subclass"—all

17  members of the Class who were classified as "Operator 12s" because they regularly worked

18  rotating 12-hour shifts; and, "Remaining Class Members"—all members of the Class who were

19  not classified as Operator 12s. [Settlement Agreement § I.F]

20          **2.      Settlement consideration**

21      Plaintiff and Defendants have agreed to fully resolve the Class claims for $800,000.

22      The Total Settlement Amount includes: (1) settlement payments to Settlement Class

23  Members ("Net Settlement Fund"); (2) attorneys' fees of $240,000 and actual litigation costs;

24  (3) Claims Administration Costs of $14,000; (4) PAGA Payment of $10,000; and (5) Service

25  Award of $10,000 to Plaintiff Steven Bailey. (Settlement Agreement § I.A-JJ)

26      The distribution of the Net Settlement Fund to Class Members is straightforward: Each

27  Class Member's share of the settlement will be proportional to the total number of workweeks

28  he or she worked during the Class Period, with ninety-percent (90%) of the Net Settlement Fund

1    allocated to "Operator 12s," and ten-percent (10%) to "Remaining Class Members." (Settlement

2    Agreement § III.D.4)  Defendants' records determined Class Members' number of workweeks,

3    and Class Members had an opportunity to challenge those records. [Settlement Agreement §

4    III.D.4.(c).(5); *see* Notice of Class Action Settlement, § 7]

5             If any Class Members opt out, the Claims Administrator will proportionately increase

6    the individual Settlement payment for each Participating Class Member to ensure that 100% of

7    the Net Settlement Fund is distributed to participating Class Members. (Settlement Agreement

8    §§ I.II., III.F.5.(d))  No portion of the Class Settlement Amount will revert to Defendants.

9    (Settlement Agreement § I.HH)

10                        **3.        Release by the Settlement Class**

11            Plaintiff and Class Members agreed to the Released Claims in exchange for the Class

12   Settlement. (Settlement Agreement §§ I.CC, III.A.)  The Released Claims cover the period from

13   May 2, 2014 through preliminary approval of this Settlement. (Settlement Agreement § I.F.)

14   Plaintiff also agreed to an additional general release of his individual claims in exchange for his

15   Service Award. (Settlement Agreement § III.A.1.)

16                **F.        Class Notice was completed pursuant to the Court Order**

17            As authorized by the Court's Order preliminarily approving the Settlement Agreement,

18   the Parties engaged CPT Group, Inc. ("CPT") to provide settlement administration services. (La

19   Decl. ¶ 2)  CPT's duties have included: (1) printing and mailing the Notice Packet; (2) receiving

20   and processing requests for exclusion; (3) resolving Settlement Class Members' disputes over

21   the number of workweeks Defendant has record of them working during the Class Period; (4)

22   calculating individual settlement award amounts; (5) processing and mailing settlement award

23   checks; (6) handling tax withholdings as required by the Settlement and the law; (7) preparing,

24   issuing and filing tax returns and other applicable tax forms; and (8) handling the distribution of

25   any unclaimed funds pursuant to the Settlement Agreement. (*Id.*)

26            On April 13, 2020 CPT received the Class Notice prepared jointly by the Parties and

27   approved by the Court. (*Id.* at ¶¶ 3)  Defendant provided CPT with a mailing list (the "Class

28   List") including each Class Member's full name, last known address, Social Security Numbers,

and information necessary to calculate payments. (*Id*. at ¶ 4)  The mailing addresses contained in the Class List were processed and updated using the National Change of Address Database maintained by the U.S. Postal Service. (*Id.* at ¶ 5)  On May 22, 2020 CPT completed the initial mailing of Class Notice to all Class Members via First-Class U.S. mail.  On June 10, 2020 CPT completed a corrective mailing. (*Id.* at ¶¶ 6-8)

Just 11 Class Members opted out and 2 Class Members objected to the Settlement. (*Id.* at ¶¶ 11-12)  And 100% of the Net Settlement Fund was claimed by all 245 Participating Class Members. (*Id.* at ¶¶ 12-13)  Class Members will receive an estimated average gross payment of $2,116.33, and an estimated highest gross payment of $5,647.01. (*Id.* at ¶ 14)

## III.    ARGUMENT

### A.    The Standard for Final Approval Has Been Met

A class action may only be settled, dismissed, or compromised with the Court's approval. Fed. R. Civ. Proc. 23(e).  The process for court approval of a class action settlement is comprised of three principal stages:

Preliminary Approval: The proposed settlement agreement is preliminarily reviewed by the Court for fairness, adequacy, and reasonableness.  If the Court believes the settlement falls within the range of reasonableness, such that proceeding to a formal fairness hearing is warranted, it orders notice of the settlement disseminated to the class. *See* Manual for Complex Litigation § 21.632 (4th ed. 2004).

Class Notice: Notice of the settlement is disseminated to the class, giving class members an opportunity to object to the settlement's terms or preserve their right to bring an individual action by opting out. *See id.*, § 21.633.

Final Approval: A formal fairness or final-approval hearing is held by the Court, at which class members can be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented.[6]  Following the hearing, the Court decides whether to approve the settlement

---

[6]    A proposed class action settlement may be approved if the Court, after allowing

1   and enter a final order and judgment. *See id.*, § 21.634.

2        The first two steps have been the completed.  The Court has preliminarily reviewed the

3   proposed settlement for fairness and found it to be within the range of reasonableness meriting

4   court approval. (*See* April 10, 2020 Order Granting Preliminary Approval of Class Settlement,

5   Docket No. 30.)  In addition, the Settlement Administrator has notified Class Members of the

6   proposed settlement and upcoming fairness hearing as directed by the Court. (*See generally* La

7   Decl.)  Plaintiff now asks the Court to grant final approval of the proposed settlement.

8        The decision about whether to approve the proposed settlement is committed to the

9   sound discretion of the trial judge, and will not be overturned except upon a strong showing of a

10  clear abuse of discretion. *Hanlon v. Chrysler Corp.* (9th Cir. 1998) 150 F.3d 1011, 1026-1027.

11  The Ninth Circuit has set forth a list of non-exclusive factors that a district court should consider

12  in deciding whether to grant final approval, namely: (1) the strength of plaintiffs' case, and the

13  risk, expense, complexity, and likely duration of further litigation; (2) the risk of maintaining

14  class action status throughout the trial; (3) the amount offered in settlement; (4) the extent of

15  discovery completed, and the stage of the proceedings; (5) the experience and views of counsel;

16  and (6) the reaction of the class members to the proposed settlement. *Id.* at 963 (citing *Molski v.*

17  *Gleich*, 318 F.3d 937, 953 (9th Cir. 2003)).

18       These factors, discussed below, confirm that the proposed Settlement is more than fair,

19  reasonable, and adequate for Class Members.  The Settlement provides considerable value;

20  Class Members need not bear the risk and delay associated with trial proceedings to obtain these

21  benefits; and the settlement has been met with substantial support from Class Members.

22

23  absent class members had an opportunity to be heard, finds that the settlement is "fair,
    reasonable, and adequate." In making this determination, "the court's intrusion upon what is
24  otherwise a private consensual agreement negotiated between the parties to a lawsuit must be
    limited to the extent necessary to reach a reasoned judgment that the agreement is not the
25  product of fraud or overreaching by, or collusion between, the negotiating parties, and that the
    settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Rodriguez v.*
26  *West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (*quoting Hanlon v. Chrysler Corp.*, 150
    F.3d 1011, 1020 (9th Cir. 1998)); *see also Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d
27  615, 625 (9th Cir. 1982) ("voluntary conciliation and settlement are the preferred means of
28  dispute resolution. This is especially true in complex class action litigation…").

1

**B.    Plaintiff's Counsel's thorough investigation led to settlement**

2       As detailed above, Plaintiff's Counsel made an informed decision about the strengths

3  and weaknesses of Plaintiff's theories of liability, Defendants' affirmative defenses, Class-wide

4  damages, benefits of Settlement based on the receipt, analysis, and application of Class Data.

5       Plaintiff's Counsel realistically assessed the value of Plaintiff's claims and intelligently

6  engaged Defendants' counsel in discussions that culminated in the Settlement.  Plaintiff's

7  Counsel can now opine with confidence that the Settlement is fair, reasonable, and adequate,

8  and is in the best interests of Class Members in light of all known facts and circumstances,

9  including: the risk of significant delay and uncertainty associated with litigation; viability of

10  Defendants' defenses; adverse judgment on liability; and potential appellate issues.

11      **C.    Settlement was reached through arm's-length bargaining by Parties**

12           **represented by experienced counsel**

13      The Parties participated in mediation with Howard Hay, Esq. (Park Decl. ¶14))

14  Mr. Hay helped manage Party expectations, and he provided a neutral analysis of the factual and

15  legal issues and risks to both sides. (*Id*.) *See In re Apple Computer, Inc. Derivative Litig.*, No. C

16  06-4128 JF (HRL), 2008 U.S. Dist. LEXIS 108195 (N.D. Cal. Nov. 5, 2008) (mediator's

17  participation weighs considerably against any inference of a collusive settlement); *In re Atmel*

18  *Corp. Derivative Litig.*, No. C 06-4592 JF (HRL), 2010 U.S. Dist. LEXIS 145551 (N.D. Cal.

19  June 25, 2008) (same); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a mediator's

20  involvement in pre-certification settlement negotiations helps to ensure that the proceedings

21  were free of collusion and undue pressure).  At all times the Parties' negotiations were

22  adversarial and non-collusive; and, the Parties reached Settlement through Mr. Hay's efforts and

23  guidance. (*Id*.)

24      Further experienced class action counsel represented the Parties in negotiations resulting

25  in Settlement.  Plaintiff's Counsel regularly litigates wage and hour class actions through

26  certification and on the merits. (Park Decl. ¶¶ 35-44; Declaration of Justin Lo [Lo Decl.] ¶¶ 2-6)

27

28

1

2

**D.     Settlement is reasonable given the strengths of Plaintiff's claims and the
risks and expense of litigation**

3

4

5

6

An important factor in approving a class action settlement is "the strength of the case for Plaintiffs on the merits, balanced against the amount offered in settlement." [*Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 130 (2008); see also *Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles*, 186 Cal. App. 4th 399, 407-8 (2010)]

7

8

As detailed above, the Settlement is fair and reasonable given the strengths of Plaintiff's claims and the various impediments to recovery.

9

10

11

12

13

14

15

16

17

It should be noted that the reasonableness of a settlement is not dependent upon the potential recovery plaintiffs might have received if they had succeeded at trial. [See *Wershba v. Apple Computer, Inc.*, 89 Cal. App. 4th 324, 346 (2001) ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved had plaintiffs prevailed at trial."); *Sutter Health Unins. Pricing Cases*, 171 Cal. App. 4th 495, 511 (2009) (emphasizing that the court must be mindful that "[t]he … class case could have gone to an incredibly lengthy and expensive jury trial, *and the class could have lost the case*" and must account for that likelihood in discounting the value of the claims for settlement purposes [emphasis in original])][7]

18

19

20

21

22

23

24

25

26

27

28

---

[7] Federal district courts recognize that there is an inherent "range of reasonableness" in determining whether to approve a settlement "which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 188 (W.D.N.Y. 2005) (*quoting Newman v. Stein*, 464 F. 2d 689, 693 (2d Cir. 1972)).  Therefore, "[t]he determination whether a settlement is reasonable does not involve the use of a 'mathematical equation yielding a particularized sum.'" *Id.* at 186, *quoting In re Michael Milken and Assoc. Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993). See *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008); see also *Nat'l Rural Telecomm. Coop. v. Directv, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004) ("well settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery"); *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 460 (S.D.N.Y. 2004) ("settlement amount's ratio to the maximum potential recovery need not be the sole, or even dominant, consideration when assessing settlement's fairness"); *In re IKON Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000) ("the fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement; rather the percentage should be considered in light of strength of the claims"); *Officers for Justice v. Civil Serv. Comm.*, 688 F. 2d 615, 628 (C.A. Cal. 1982) (it is "the complete package, taken as a whole rather than the individual component parts, that must be examined for overall fairness").

Here Defendants heavily dispute that Plaintiff and Class would ultimately succeed on the merits. Consequently Plaintiff faces numerous risks in continued litigation, including: (1) losing on class certification; (2) losing on liability; (3) the risk of obtaining a lesser amount than the Settlement after years of litigation and a lengthy and costly class-action trial; and (4) the risk a class certification order or judgement will be held in abeyance by the appellate process. Hence Plaintiff's Counsel's analysis and investigation in valuing the case included the real possibility that Class Members would not recover anything after years of litigation.

The Settlement here guarantees that Defendants will pay $800,000 to Class Members for their alleged damages. Therefore this Settlement easily falls within the range of reasonableness because it provides a significant and timely recovery to Class Members.

In short—and given the substantial risks in continued litigation, including the uncertainty of success—the Settlement represents a reasonable compromise of Plaintiff's claims and ensures that Class Members will receive a fair and adequate recovery.

**E.    Settlement Class has responded positively to the Settlement**

As detailed above, Class Members' response demonstrates support for this settlement—just 11 Class Members opted out and 2 Class Members objected to the Settlement. And 100% of the Net Settlement Fund was claimed by all 245 Participating Class Members.

The two Class Members' objections do not present evidence and argument concerning the fairness, adequacy and reasonableness of the settlement. One Class Member—Mike Benifacio—demands that each class member should receive $35,900 as compensation for every day of the year for the past 6 years. This argument 1) ignores that the Settlement is a compromise weighing the strengths of Plaintiff's claims and the risks and expense of litigation; and, 2) the numbers are not premised on reliable Class data; but, instead, Mr. Benifacio's own arbitrary calculations. So the objection is not reasonable and should be discarded. (Park Decl. ¶ 30)

Second Class Member's "objection" is a two-sentence letter. Brett Dickens simply states that, "I do not believe this is a fair compensation for the rest periods missed." He does not provide any other information. Needless to say, the objection is not valid because it does not

1   present any evidence and argument concerning the fairness, adequacy and reasonableness of the

2   Settlement. (Park Decl. ¶ 30)

3       **F.     The proposed PAGA settlement is reasonable**

4       Ten thousand dollars ($10,000) from the Total Settlement Amount are allocated to the

5   resolution of Plaintiff's PAGA claims—75% of which will be paid directly to the LWDA.

6   [Settlement Agreement § I.Y.]  The agreement was reached after good-faith negotiation between

7   the Parties. (Park Decl. ¶ 31)  Where PAGA penalties are negotiated in good faith and "there is

8   no indication that [the] amount was the result of self-interest at the expense of other Class

9   Members," such amounts are generally considered reasonable. *Hopson v. Hanesbrands Inc.*,

10  Case No. 08-00844, 2009 U.S. Dist. LEXIS 33900, at *24 (N.D. Cal. Apr. 3, 2009); see, e.g.,

11  *Nordstrom Com. Cases*, 186 Cal. App. 4th 576, 579 (2010) ("[T]rial court did not abuse

12  discretion in approving a settlement which does not allocate any damages to the PAGA….")

13      As for the legislative intent of PAGA, the allocation for PAGA penalties is sufficient to

14  satisfy the dual purpose of deterrence and punishment, given that Defendant will also be

15  required to pay such a large amount in unpaid wages through the class settlement.  A larger

16  allocation could rise to the level of an "unjust, arbitrary, and oppressive, or confiscatory"

17  amount, given that it would provide double punishment in light of the class settlement payments

18  already being awarded to Class Members.  Moreover, this allocation takes into account the fact

19  that the Court has discretion to reduce the PAGA award if Plaintiff prevailed on this claim at

20  trial. See, e.g., *Fleming v. Covidien, Inc.*, No. ED CV10-01487, 2011 U.S. Dist. LEXIS 154590,

21  at *8–9 (C.D. Cal. Aug. 12, 2011) (slashing PAGA penalties for wage statement violations by

22  over 500%, from $2.8 million to $500,000).

23      **G.     Class Representative Enhancement Payment is reasonable**

24      Named Plaintiffs are eligible for payments that reasonably compensate them for

25  undertaking and fulfilling a fiduciary duty to represent absent class members. [*Cellphone*

26  *Termination Fee Cases*, 186 Cal. App. 4th at 1393; *Bell v. Farmers Ins. Exchange*, 115 Cal.

27  App. 4th 715, 726 (2004) (upholding "service payments" to named Plaintiffs for their efforts in

28  bringing the case)]  "Incentive awards are fairly typical in class action cases.  Such awards are

1    intended to compensate class representatives for work done on behalf of the class . . . ."

2    [*Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 958 (9th Cir. 2009) (citing 4 William B.

3    Rubenstein et al., Newberg on Class Actions § 11:38 (4th ed. 2008)] These payments work both

4    as an inducement to participate in the suit and as compensation for time spent in litigation

5    activities. [See *In re Mego Fin. Corp. Sec. Litig*., 213 F.3d 454, 463 (9th Cir. 2000) (describe

6    the service award as an *incentive* to the class representatives)]

7            The Parties have negotiated $10,000 for Plaintiff's Service Award in recognition of his

8    following efforts: originating the action; providing relevant documents to Class Counsel;

9    serving as a private attorney general under PAGA; regularly conferring with Class Counsel on

10   case status and strategies for prosecuting the claims; traveling and attending an all-day

11   mediation with Howard Hay, Esq. in Irvine, California; and, reviewing the Settlement to ensure

12   its fairness and adequacy for the Class. (Park Decl. ¶¶ 32-24; Declaration of Steven Bailey ¶¶ 4-

13   7)  Further other Class Members would not have recovered at all, but for Plaintiff's actions. (*Id.*)

14           Courts have also recognized that employees face a particular set of challenges when

15   bringing class action suits.  Current employees risk retaliation or, less explicitly, greater

16   difficulties in the workplace as a result of bringing suit. [See *Guippone v. BH S&B Holdings*

17   *LLC*, No. 09 Civ. 1029, 2011 U.S. Dist. LEXIS 126026, at *20 (S.D.N.Y. Oct. 28, 2011) ("Even

18   where there is not a record of actual retaliation, notoriety, or personal difficulties, class

19   representatives merit recognition for assuming the risk of such for the sake of absent class

20   members"]  Both current and former employees place their future employment prospects in peril

21   by becoming class representatives, as "the fact that a plaintiff has filed a federal lawsuit is

22   searchable on the internet and may become known to prospective employers when evaluating

23   the person." (*Id.* at *4)

24           Plaintiff has assumed considerable reputational risk that may impact their employability

25   in the near and distant future.  Long after this action is forgotten by Class Members, Plaintiff

26   will have to endure the risk of being branded "litigious" by prospective employers, and may

27   have employment applications rejected on that basis. (Park Decl. ¶ 33)

28

1

**H.      Claims Administrator Costs is reasonable and should receive final approval**

2      Plaintiff requests final approval of settlement administration costs of $14,000. (La Decl.

3 ¶ 15)  CPT has promptly and properly distributed the Class Notice to all Class Members and

4 completed their duties in accordance with the Settlement terms and the Court's preliminary

5 approval Order. (*See generally* La Decl.)  Accordingly the $14,000 payment is fair and

6 reasonable and should be accorded final approval along with the rest of the Settlement terms.

7 **IV.    CONCLUSION**

8      As detailed above, the Parties have negotiated a Settlement that is undoubtedly fair,

9 reasonable, and adequate—and easily meets approval under Fed. R. Civ. P. and California law.

10 The Parties respectfully request that this Court grant final approval of the Settlement Agreement

11 and enter judgment.

12

13

14      Respectfully Submitted,

15 Dated: August 27, 2020      MATHEW & GEORGE

16

17      *Sang J Park*

18 By:_____

19      Sang J Park

20      Attorneys for Plaintiff and Class

21

22

23

24

25

26

27

28